Exhibit C

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:17-cr-00082-KJM |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| RAUL RIKARDS CARRILLO, | |
| Defendants. | |

On May 20, 2019, defendant Raul Rikards Carrillo pled guilty to violating 21 U.S.C §§ 841(a)(1) and 846, by conspiring to possess with intent to distribute at least 50 grams of methamphetamine (actual). Plea Agreement, ECF No. 59. On November 4, 2019, the court held an initial sentencing hearing and, among other matters, heard from the parties regarding Carrillo's request for a sentence below the range calculated under the current U.S. Sentencing Guidelines (Guidelines) based on a policy disagreement with the Guidelines' provisions with respect to methamphetamine. ECF Nos. 91, 98, 100. Because the government had not filed opposition briefing, the court continued the matter and directed briefing. ECF No. 94. After the deadline for the government's brief passed, defense counsel filed a short supplemental brief. Def.'s Supp. Brief, ECF No. 98. On December 9, 2019, the court held a further sentencing hearing to discuss with the parties the import of the government's having not filed any further

briefing, and then reset the matter one more time. ECF No. 100. The court held the final sentencing hearing on February 3, 2020, on which date it pronounced sentence. ECF No. 110. As explained below, in the course of sentencing Mr. Carrillo, the court declared a policy disagreement with the methamphetamine Guidelines.

I.     FACTS AND PROCEDURAL HISTORY

A San Joaquin County Sheriff's Deputy arrested defendant Raul Rikards Carrillo on May 22, 2017, after his codefendant John Ayon was arrested following a traffic stop during which a drug detection dog sniff led to the discovery of a duffel bag with approximately 40 pounds of methamphetamine in cellophane wrapped bundles. Compl., ECF No. 1, at 3-4. Another Deputy had observed Ayon's car on the freeway pacing the Chevrolet Camaro driven by Carrillo, which suggested to the Deputy possible narcotics trafficking. *Id.* After conducting a traffic stop of the Camaro, Deputy Jones asked Carrillo about the contents of the vehicle; Mr. Carrillo said there was nothing illegal in the vehicle. *Id.* at 4. Mr. Carrillo granted the Deputy verbal consent and confirmed his consent to another Deputy who also arrived on the scene. *Id.* Upon a search of a vehicle, one of the Deputies found two cellophane wrapped bundles in the trunk, packaged similarly to the bundles found in Ayon's car; upon testing the bundles were identified as two pounds of actual methamphetamine, with purity levels of 99 percent and 96 percent, respectively. *Id.*; Plea Agreement at 13 (factual basis).

Carrillo and his codefendant each were charged in multiple counts. Superseding Indictment, ECF No. 19. As noted, on May 20, 2019, Carrillo pled guilty to one count charging a violation of 21 U.S.C. §§ 841(a)(1) and 846, conspiracy to possess with intent to distribute at least 50 grams of methamphetamine (actual). Plea Agreement at 2. In the factual basis attached to his plea agreement, Carrillo admitted to all the essential facts alleged in the initial criminal complaint. *Id.* at 11-13. For sentencing purposes, as most relevant here, the government agreed to recommend Carrillo receive the benefit of the safety-valve provisions of 18 U.S.C. § 3553(f)(5) and § 5C1.2(a) of the Guidelines, *id.* at 5, relieving Carrillo of the mandatory minimum sentence of 10 years that otherwise would apply without the filing of an information identifying Carrillo's prior felony. Superseding Indictment at 2:1-5; 21 U.S.C. § 851.

1         In the Presentence Investigation Report (PSR), the Probation Officer calculated
2 Carrillo's applicable offense level as 33, reflecting among other things application of the safety-
3 valve, which the government agreed was satisfied. PSR, ECF No. 80 (sealed), at 3, 15. With a
4 criminal history category of I, reflecting no prior scorable criminal offenses, the Guidelines range
5 is 135 to 168 months of imprisonment with a two to five year term of supervised release. *Id.* The
6 Probation Officer recommended 135 months of imprisonment, at the low end of the Guidelines
7 range, and three years of supervised release, observing that Carrillo's history of substance use,
8 prior criminal convictions, and illegal reentry into the country warrant three years of supervised
9 release, should he not be deported, to assist in integrating him back into the community. *Id.* at 15.
10         In his sentencing memorandum, Carrillo, through counsel, requests a sentence of
11 48 months and, as noted, invites the court to declare a policy disagreement with the
12 methamphetamine sentencing Guidelines. Sentencing Mem., ECF No. 91, at 1, 8. While the
13 government has not responded in substance to this aspect of the defense argument, government
14 counsel suggests the correct base offense level here is tethered to the actual amount of
15 methamphetamine seized from Carrillo and his codefendant because the substance was tested and
16 the amount and purity confirmed very early in the case. Tr. of Sentencing Hr'g, ECF No. 104, at
17 5:23-6:20. If there should be a variance, the government argues without conceding the point that
18 the base offense level should be reduced by four levels, from 38 to 34, to "disregard[] the
19 sentencing guidelines distinction between actual and mixture and substance." Tr. 6:21-7:03; *see*
20 PSR at 6. In response, the defense clarifies its position is not merely that actual
21 methamphetamine should be treated the same as a mixture of methamphetamine for Guidelines
22 calculations purposes, Tr. 7:21-23, but that more broadly there is no empirical basis for the
23 methamphetamine Guidelines at all, Tr. 8:02-07.
24 II.    <u>LEGAL PRECEDENT RE: POLICY DISAGREEMENTS WITH GUIDELINES</u>
25         In *Spears v. United States*, the Supreme Court held the district court had the
26 authority to determine the "Guidelines' 100:1 ratio between powder cocaine and crack cocaine
27 quantities yielded an excessive sentence in light of the sentencing factors outlined in 18 U.S.C.
28 § 3553(a)." *Spears v. United States*, 555 U.S. 261, 262 (2009). In *Spears*, the Supreme Court

clarified its holding in *Kimbrough v. United States*, which recognized "district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears*, 555 U.S. at 264 (emphasis in original); *see also Kimbrough v. United States*, 552 U.S. 85 (2007). In other words, as a result of a disagreement with the Guidelines, a district court may reject and vary categorically from the crack cocaine Guidelines. *Spears*, 555 U.S. at 265–66 (approving district court's substitution of its own ratio for that of the Guidelines in crack cocaine sentencing). This leeway applies even in cases in which a defendant does not present with any mitigating circumstances. *Id.* at 263. As reviewed more particularly below, several district courts have relied on the authority of *Spears* to vary from the Sentencing Guidelines for methamphetamine as a result of a policy disagreement. *See United States v. Johnson*, 379 F. Supp. 3d 1213, 1227 (M.D. Ala. 2019); *United States v. Hayes*, 948 F. Supp. 2d 1009, 1014 (N.D. Iowa 2013); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1252 (D.N.M. 2017).

        Title 18 United States Code § 3553 prescribes the familiar factors a court should consider when imposing a sentence. Among other factors, courts are to consider the "nature and circumstances" of the offense and the defendant, deterrence and public safety, as well as the kinds of sentences and sentencing and sentencing ranges available. 18 U.S.C. § 3553(a)(1)–(4). When determining the sentence to be imposed, the court shall examine in particular the seriousness of the offense, the need for adequate deterrence to criminal conduct, the necessity of protecting the public from additional crimes, and the most effective method of providing defendant with needed training, medical care or other correctional treatment. 18 U.S.C. § 3553(a)(2)(A)–(D).

III.    <u>OTHER COURTS' POLICY DISAGREEMENTS WITH METHAMPHETAMINE GUIDELINES</u>

        While several district courts have declared a policy disagreement with the methamphetamine Guidelines, these courts have taken different approaches in doing so. In *United States v. Hayes*, the judge in the Northern District of Iowa adopted as a starting point the approach previously articulated by another district judge in New York for heroin, powder cocaine

and crack cocaine in the case of *United States v. Diaz. Hayes*, 948 F. Supp. 2d at 1031 (citing *United States v. Diaz*, No. 11-CR-00821-2 (JG), 2013 WL 322243 at *16 (E.D.N.Y. Jan. 28, 2013) (advocating policy disagreement departures from Guidelines as part of constructive dialogue with Congress and Sentencing Commission). He then applied a one-third reduction to the Sentencing Guidelines' scoring of methamphetamine, reasoning the one-third reduction served as a "good starting point and a reasonable way to express [...] policy disagreement with the Guidelines." *Hayes*, 948 F. Supp. 2d at 1031. The judge in *Hayes* expressed a concern generally that, with respect to methamphetamine, the Sentencing Commission had strayed from its institutional role and not based the Guidelines on empirical data; he also characterized the Guidelines as "excessive" in nature in a way that does not "constitute the typical case or heartland," particularly given the lack of any consideration of a defendant's role in the conviction offense. *Id.* at 1021–31. As a basis for his one-third reduction, the judge adopted the recommendation of the judge in *Diaz,* that ranges should be lowered in drug trafficking cases by a third to account for the Guidelines' disconnection from drug trafficking defendants' true culpability. *Id.* at 1018 (citing *Diaz*, 2013 WL 322243 at *18). After effecting the one-third reduction, the judge in *Hayes* explained his approach would then "reserve the ability to adjust the figure upwards and downwards as I weigh the 18 U.S.C. § 3553(a) factors." *Id.* at 1031.

The judge in *Hayes* addressed similar issues in *United States v. Nawanna*, and declined to apply his approach of starting with a one-third reduction because Nawanna "was not merely a low-level, generally non-violent addict dealer" and instead "was a large-scale distributor, with a managerial or supervisory role in the enterprise (although he was not an organizer or leader), [and] he possessed a dangerous weapon." *United States v. Nawanna*, 321 F. Supp. 3d 943, 956–57 (N.D. Iowa 2018). Given these facts, the judge began by calculating the Guidelines' base offense level by equalizing methamphetamine with a "methamphetamine mixture." *Id.* at 956 (rejecting marijuana equivalency conversion). Unpersuaded by the prosecution's argument that the increased prevalence of pure methamphetamine indicated a greater degree of culpability as "based on a flawed assumption that methamphetamine purity is a proxy for role in the offense," the judge then varied downward

based on the sentencing factors in § 3553. *Id.* at 955. In reaching this conclusion the judge in *Nawanna* cited to yet another district judge's analysis of the increased prevalence of pure methamphetamine reaching the same conclusion in the case of *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D.N.M. 2017) (ultimately concluding "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality."). *Id.* at 954.

In *Ibarra-Sandoval*, the judge in New Mexico classified the methamphetamine for which the defendant was held accountable as a "methamphetamine mixture" based not only the ready availability of pure methamphetamine, but also because the defendant "was a low-level courier who didn't even know the contents of the bag he carried except that they contained drugs [who…] happened to have the misfortune of trafficking in methamphetamine-actual instead of the less heavily punished methamphetamine-mixture[.]" *Ibarra-Sandoval*, 265 F. Supp. 3d at 1256.

At this point, a number of other district court decisions have relied on the analyses in *Nawanna* and *Ibarra-Sandoval* to conclude that pure methamphetamine should be equalized to a methamphetamine mixture for purposes of the Guidelines' calculation step in federal sentencing. *See, e.g., United States v. Harry*, 313 F. Supp. 3d 969, 974 (N.D. Iowa 2018) (incorporating "*Nawanna* by reference" and applying it to defendant with extensive criminal history); *United States v. Ferguson*, Crim. No. 17-204 (JRT/BRT), 2018 WL 3682509, at *4 (D. Minn. Aug. 2, 2018) (holding "methamphetamine purity is no longer a proxy for, and thus not probative of, the defendant's role or position in the chain of distribution").

In *United States v. Johnson*, a district judge in the Middle District of Alabama more recently declared a policy disagreement with the methamphetamine Guidelines based on their inherent assumptions regarding purity and quantity. *Johnson*, 379 F. Supp. 3d at 1228. This judge found that "the offender's role in the crime is more useful for determining culpability than the quantity of drugs involved." *Johnson*, 379 F. Supp. 3d at 1220 (citing *Diaz*, 2013 WL 322243, at *13). He also embraced the concept of "false uniformity," articulated by another judge more than a decade ago; this concept addresses circumstances "when we treat equally individuals who are not remotely equal because we permit a single consideration, like drug

6

quantity, to mask other important factors." *Johnson*, 379 F. Supp. 3d at 1221 (quoting *United States v. Cabrera*, 567 F. Supp. 2d 271, 273 (D. Mass. 2008)). The Alabama judge reached the same conclusions as did the courts in *Nawanna* and *Ibarra-Sandoval*, that the purity of actual methamphetamine does not automatically translate to greater culpability, even though the Guidelines have that effect. *Johnson*, 379 F. Supp. 3d at 1223–26 (citing *Nawanna*, 321 F. Supp. 3d at 951, and *Ibarra-Sandoval*, 265 F. Supp. 3d at 1255). But this judge devised a two-step process to reflect his disagreement with the Guidelines. *Johnson*, 379 F. Supp. 3d at 1229. First, to take account of the "purity critique," which he found valid, he calculated the base-offense level by using the methamphetamine mixture Guidelines provision. *Id.* Second, to reflect the "quantity critique," which he also found valid, he decreased the methamphetamine mixture base offense level by two levels "to offset the excessive significance that the drug-trafficking Guidelines assign to the quantity of drugs, which do not always--and do not here--reflect the offender's role, and thus culpability." *Id.* Regarding the second step, the judge indicated that he would not always adjust downward by two levels, but rather would make an appropriate adjustment tailored to the offender's role on a case-by-case basis. *Id.*

As explained below, this court finds the synthesis embodied in the *Johnson* judge's decision the most helpful and is persuaded, based on the current record, that the first step of the *Johnson* approach is the most fair and reasonable method of addressing the purity issues raised by the defense. While this court may in the future also move to the second step of the *Johnson* approach, in this case it does not find a reduction of two levels or otherwise warranted; the court instead determines it can address any additional adjustments required through traditional application of the § 3553 factors, also addressed below.

IV. DISCUSSION

The court below addresses each of the defendant's arguments in support of his motion for a downward variance.

A. Quantity and Purity as Related to Culpability

Defense counsel argues that while quantity and purity drive the Guidelines' scoring of methamphetamine offenses, those features of the methamphetamine in a given case do

1  not correspond to culpability. Sentencing Mem. at 2. As the judge in *Johnson*, observed, "[o]ver
2  the past decade, courts have increasingly recognized that 'drug quantity is a poor proxy for
3  culpability.'" *Johnson*, 379 F. Supp. 3d at 1220 (quoting *Diaz*, 2013 WL 322243, at *13). While
4  defense counsel acknowledges the Guidelines' allowance for lesser roles in a criminal offense
5  through the availability of mitigating role adjustments, she argues that the base offense levels for
6  methamphetamine, driven by quantity, span up to level 38 and thus "dwarf" role adjustments,
7  which provide for adding or subtracting up to only four levels. Sentencing Mem. at 2
8  (referencing U.S.S.G. §§ 3B1.1, 3B1.2). Because the purity of methamphetamine across the
9  nation, especially on the West Coast and in California, has increased dramatically while the price
10 has dropped, defense counsel also argues linking drug purity to criminal role is flawed.
11 Sentencing Mem. at 3 (citing DEA Intelligence Report (July 2018)); *see also Johnson*,
12 379 F. Supp. 3d at 1224. As a result, defense counsel argues a low-level courier today "is likely
13 to be carrying a larger quantity than a low-level courier in exactly the same position on the
14 hierarchy several years ago." Sentencing Mem. at 5. And the lower a person is in a drug
15 trafficking operation, the less decision-making power he has regarding either the quantity or
16 purity of the substance he handles. *Id.* In other words, the defense posits, applying the same
17 Guidelines to current offenders as have been applied in the past creates unsupported disparities
18 across a relatively short timeframe, with essentially the same low-level courier today receiving a
19 greater sentence than a low-level courier in the past, despite being no more culpable. *Id.*

20          As the judge in *Johnson* explained, when the Sentencing Commission first adopted
21 the Sentencing Guidelines, "it failed to explain why it decided to implement the quantity-based
22 approach for all trafficking offenses." *Johnson*, 379 F. Supp. 3d at 1219 (citing United States
23 Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the*
24 *Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 49-50 (2004),
25 (noting omission of reasoning for adoption of quantity-based Guidelines in 1987's *Guidelines*
26 *Manual, Supplementary Report* (USSC, 1987)). Since then, a growing number of decisionmakers
27 have observed that while quantity can reflect culpability or a defendant's role in a scheme, in
28 many cases it does not do so. *Johnson*, 379 F. Supp. 3d at 1219–21; *see also United States v.*

8

*Cabrera*, 567 F. Supp. 2d 271, 276 (D. Mass. 2008) (granting downward variance when "delivery man" was apprehended as part of sting and quantity he possessed did not reflect his role in enterprise). Rather, the *Johnson* court opined that "the offender's role in the crime is more useful for determining culpability than the quantity of drugs involved." *Id.* at 1220 (citing *Diaz*, 2013 WL 322243, at *13).

With regard to purity as a measure of culpability, the Guidelines state: "Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1, cmt. n.27(C). Since the Guidelines first took effect, unusually pure methamphetamine has become increasingly more common. *Johnson*, 379 F. Supp. 3d at 1224 (citing *Nawanna*, 321 F. Supp. 3d at 951, for its reliance on "2017 DEA report stating that, from 2011 to 2016, 'the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and most recently, for the third quarter of 2016, averaged 93.5 percent pure.'"). As noted above, a number of courts have acknowledged this increase in purity of the methamphetamine being marketed in the country by rejecting the actual methamphetamine Guidelines, which impose higher offense levels tied to purity. *See United States v. Henry*, 313 F. Supp. 3d 969, 974 (N.D. Iowa 2018); *United States v. Saldana*, No. 1:17-CR-271-1, 2018 U.S. Dist. LEXIS 110790, at *7-8 (W.D. Mich. July 3, 2018); *Ferguson, supra*, 2018 WL 3682509, at *1; *see also* U.S.S.G. § 2D1.1 (drug table assigns score of **38** to 45 kilograms of methamphetamine mixture or 4.5 kilograms of actual methamphetamine, for example, and **34** to 1.5 to 5 kilograms of methamphetamine mixture and 150 to 500 grams of actual methamphetamine).

The court in *Johnson*, as noted above, chose to address the purity issue by assigning the base offense level for a methamphetamine mixture, calculated using the quantity of actual methamphetamine for which the defendant was held accountable. *Johnson*, 379 F. Supp. 3d at 1229. Because this approach preserves reliance on the Guidelines as a starting point, while adjusting the offense level score to reflect changed circumstances since the Guidelines were

adopted, this court follows suit. Accordingly, by way of a variance based on a policy disagreement with the Guidelines' assumptions regarding purity, the court in this case assigns a base offense level of 34 given that defendant is held accountable here for 367,181 kilograms. *See* PSR ¶ 20; U.S.S.G. § 2D1.1(c)(1). The government signaled this adjustment as appropriate if the court were persuaded by the defense argument as to purity, while also signaling this is the only adjustment that might be warranted.

### B.   Proportionality: Methamphetamine and Crack Cocaine

As noted, defense counsel argues the harshness of the methamphetamine Guidelines has no empirical basis at all. Sentencing Mem. at 6. Rather than resulting from an empirical assessment of the harm caused by methamphetamine, the defense says, the Guidelines were instead a response to Congressional action not based on meaningful study or review, but instead on the notion that methamphetamine and crack cocaine were equally harmful. *Id.* at 7, n.2 ("The Commission simply followed a congressional directive [. . .] That Act was not the product of any congressional hearings [. . .] Rather, proponents 'merely asserted that the use of methamphetamines in this country is an emerging epidemic,' and presented 'anecdotal evidence' of violence."). As the defense notes, the methamphetamine Guidelines resulting from Amendment 594 in 2000 tied methamphetamine to crack cocaine, treating the two controlled substances equally. *Id.* at 7-8; Amendment 594, Federal Sentencing Guidelines Manual § 2D1.1 (2000) (increasing ratio for methamphetamine to match crack cocaine). Given that the crack cocaine Guidelines have been adjusted downward to reflect a closer equivalency between crack and powder cocaine, defense counsel argues methamphetamine should now be treated equally to powder cocaine. *Id.* at 8; *see* Fair Sentencing Act of 2010, S. 1789, 111th Cong. § 2(a) (reducing crack/powder cocaine ratio from 100:1 to 18:1); *see also* Sentencing Guidelines for United States Courts, 75 Fed. Reg. 66188-02 (Oct. 27, 2010) (implementing temporary, emergency amendment to Guidelines effecting ratio change mandated by Fair Sentencing Act). In this case, if the court were persuaded by this argument, Mr. Carrillo's base offense level would score as 32. Sentencing Mem. at 8.

/////

The court has carefully considered the defense argument in this respect, and reviewed the helpful discussion in the *Hayes* case of the problems with tying the methamphetamine Guidelines initially to those for crack cocaine. *Hayes*, 948 F. Supp. 2d at 1024. The court also notes the review in *Hayes* of various experts' views, that while it is difficult to measure the harmfulness of a drug, methamphetamine may be less harmful than crack cocaine, as well as alcohol and heroin. *Id.* at 1026–27 (citing Amy Baron-Evans, *Variance, Departures and Deconstructing the Meth Guidelines: Current Trends and Cautionary Tales*, CJA Trial Panel Annual Training (Dec. 12, 2012), at 119; David J. Nutt et al., Drug Harms in the UK: a multicriteria decision analysis, 376 *The Lancet* 1558 (2010)). While this court is persuaded that the initial linkage of the two controlled substances, methamphetamine and crack cocaine, was not grounded in empirical wisdom, reaching this conclusion is not the same as finding on the current record that the court can equalize the two by way of variance. To take that additional step, in this court's view, would require a careful review of peer-reviewed scientific information, through a full-fledged evidentiary proceeding.

C. 18 U.S.C. § 3553(a) Factors, Including Role

While the court has declined to accept defendant's other Guidelines-related arguments for a variance based on his role in the offense, it does find a downward variance warranted based on a traditional application of the statutory sentencing factors set forth in 18 U.S.C. § 3553. Defense counsel argues a downward variance is appropriate because Mr. Carrillo was relatively low in the hierarchy of the drug trafficking organization he operated within, he did not negotiate the quantity of the drugs, and he agreed to assist the person above him in the hierarchy, identified as Person 1, in the operation at a time of increasing "pressure from traffickers to unload large quantities." Sentencing Mem. at 6 (quoting Frances Robles, THE NEW YORK TIMES, "Meth, the Forgotten Killer, Is Back, and It's Everywhere" (Feb. 13, 2018)). Moreover, counsel argues, Mr. Carrillo's work history demonstrates he has not relied generally on a criminal lifestyle to support himself; instead, his actions here represent an exception, occurring "at a time of increased financial stress, a number of personal crises, and exacerbated drug addiction." *Id.* (citing PSR ¶¶ 17, 52, 56-61). Because the government undoubtedly will

deport Mr. Carrillo after he serves his sentence, counsel says he does not pose a danger to the community. *Id.* at 9. After serving his sentence, she notes Mr. Carrillo plans to return to Mexico and open a business for tourists after selling some land he owns; he has family in Mexico prepared to assist him in this effort. *Id.* The defense also argues that because Mr. Carrillo's immigration status will preclude his obtaining good time credit for participation in Bureau of Prisons' programming, this factor supports a variance as well. *Id.* Counsel also correctly notes Mr. Carrillo's longest prior sentence was six months, which he served over twenty years ago. *Id.*

Here, as the court explained from the bench at sentencing, defendant's role in the conviction offense does support a further downward variance, from a low end sentence of 87 months. On the one hand, defendant had some control over and carried insurance for a car with a special compartment for transporting drugs, was traveling in tandem with his codefendant in transporting methamphetamine from Los Angeles to northern California and previously had himself sold a one pound block of methamphetamine he apparently earned following a prior transport operation – all of which are aggravating factors. *See* PSR ¶¶ 5-13; Plea Agreement at 11-12 (factual basis). On the other hand, defendant was not a leader of the organization for which he transported the methamphetamine, there is no indication he negotiated for a particular amount of controlled substance at any time, his movements during the transport operation to northern California were carefully monitored by personnel who were above him in the organization – all mitigating factors. *See* Decl. of Raul Rikards Carrillo, ECF No. 84-1, ¶¶ 1-10.[1] Defendant is a nonviolent offender with a prior history of essentially lawful employment. PSR ¶¶ 56-61. His longest prior criminal sentence was six months. *Id.* ¶¶ 34-37. On balance, the court finds that a sentence of 68 months is sufficient but not greater than necessary to achieve the purposes of federal sentencing.

V.  CONCLUSION

For the reasons stated above, the court declares a policy disagreement with the methamphetamine Guidelines. Based on that disagreement, the court varies downward, first to a

---

[1] At hearing, the government indicated it had no evidence to rebut the contents of defendant's declaration.

sentencing range of 87-108 months, based on a Guidelines equivalent calculated using Offense Level 29 while maintaining Mr. Carrillo's Criminal History I. The court then varies further downward from the 87 months at the low end of this range, based on the § 3553 factors, to a sentence of 68 months' incarceration, with a term of supervised release of 3 years.

        IT IS SO ORDERED.

DATED: February 21, 2020.